### UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

---

CALEB BRENNAN SMITH and STEPHANIE
HOPE SMITH,

Civil No. 21-1747 (JRT/ECW)

Plaintiffs,

v.

**FINDINGS OF FACT AND CONCLUSIONS
OF LAW**

UNITED STATES OF AMERICA,

Defendant.

---

Cody Scharpf, James S. Ballentine, and Max Henry Hacker, **SCHWEBEL,
GOETZ & SIEBEN, P.A.,** 80 South Eighth Street, Suite 5120, Minneapolis, MN
55402, for Plaintiffs.

Andrew Tweeten and Lucas B. Draisey, **UNITED STATES ATTORNEY'S
OFFICE**, 600 United States Courthouse, 300 South Fourth Street,
Minneapolis, MN 55415, for Defendant.

Plaintiffs Stephanie Hope Smith and her son Caleb Brennan Smith[1] were injured

when they were involved in a vehicle accident on June 19, 2018, during which their vehicle

was struck by a United States Postal Service ("USPS") truck driven by USPS employee

David Jerome Lodermeier, acting within the scope of his employment.  Plaintiffs brought

this action against the United States under the Federal Tort Claims Act ("FTCA"), seeking

---

[1] Though Caleb Smith was a minor when this case was initiated and was previously
referred to by his initials, C.B.S., he has now attained the age of majority and pursues these claims
against the United States in his own right.  The Court will therefore refer to him by name.

past and future damages for their injuries. The Court conducted a bench trial on May 16, 17, and 18, 2023, and the parties provided final written submissions after the bench trial. Having considered the evidence and arguments of counsel, the Court now enters the following Findings of Fact, Conclusions of Law, and Order for Judgment, pursuant to Federal Rule of Civil Procedure 52(a)(1).[2]

## FINDINGS OF FACT

1. The Findings of Fact set forth herein are undisputed or have been proven by a preponderance of the evidence.

2. To the extent the Court's Conclusions of Law may include what may be considered Findings of Fact, they are incorporated herein by reference.

## I.   THE ACCIDENT

3. On June 19, 2018, at about 2:15 p.m., Stephanie was driving southbound in a white 2007 Toyota Prius in the center lane of Minnesota State Highway 100 in

---

[2] During the bench trial, the Court considered Defendant's Motion to Exclude Late-Disclosed Facts and Witnesses. (Mot. Limine, May 1, 2023, Docket No. 74.) The Court indicated that it would only admit Joint Exhibits 35, 95, 96, and 100 upon submission of evidence pertaining to why they were untimely disclosed. (Trial Tr., 21:25–22:8, May 25, 2023, Docket No. 98.) Because the Plaintiffs have not provided such evidence, and the Court does not rely upon those exhibits here, the Court will grant the Defendant's Motion to Exclude those exhibits.

St. Louis Park, Minnesota, with Caleb in the front passenger seat. (Tr. 44:13–25, 71:2–10, 246:16–247:12; Ex. 103.)[3]  Caleb was thirteen years old at the time. (Ex. 8 at 1.)

4. Traffic was steady, not bumper-to-bumper, and the weather was clear. (Tr. 247:13–16, 314:1–3.)

5. As the Smiths approached the Cedar Lake Road interchange, a white van traveling southbound ahead of them in the left lane dropped an improperly secured extension ladder onto the road, blocking the center and left lanes of the highway. (Tr. 45:3–12, 248:9–249:5; Ex. 103 at 2.)

6. Traffic, including the Smiths, abruptly stopped to avoid this sudden obstruction of the road. (Tr. 45:17–21, 249:6–20, 312:25–313:25.)

7. A USPS tractor-trailer, driven by USPS employee David Lodermeier within the scope of his employment, had just merged onto southbound Highway 100, had not yet reached the speed limit, and was traveling behind the Smiths in the center lane of Highway 100 when the ladder dropped. (Tr. 467:10–25, 469:16–470:25.)

---

[3] Citations to "Tr." refer to the three-volume transcript of the trial conducted in May 2023. (Trial Tr., May 25, 2023, Docket Nos. 98–100.)  For the sake of clarity, the Court will use the consecutive pagination across all three volumes.  Citations to "Ex." refer to trial exhibits. (*See* Joint Ex. List, May 1, 2023, Docket No. 60.)

8. Mr. Lodermeier braked as hard as possible and significantly reduced the speed of the USPS truck but was unable to come to a complete stop short of the traffic immediately behind the ladder. (Tr. 469:24–470:13, 471:20–472:1.) This was in part because the large USPS truck takes a longer time to bring to a stop than a car. (Tr. 484:7–10.)

9. The USPS truck hit the rear passenger corner of the Smiths' vehicle in the center lane and squarely rear-ended a red vehicle in the right lane. (Tr. 473:2–25; Ex. 103 at 18–28.)

10. The airbags of the Smiths' Toyota Prius did not deploy and neither Stephanie nor Caleb lost consciousness. (Tr. 73:19–25.) The back of Stephanie's and Caleb's heads collided with their headrests. (Tr. 73:23–25, 250:19–251:4.)

11. The USPS truck was not the only vehicle that rear-ended another vehicle as a result of the ladder falling onto Highway 100. (Tr. 312:25–313:25.)

12. The white van drove away from the accident scene without stopping to be identified or to investigate the accident. (Tr. 109:4–13.)

13. USPS supervisor Scott Van Heel arrived at the scene of the accident, investigated the cause of the collision, and determined that the collision was caused by Mr. Lodermeier's failure to maintain proper following distance. (Tr. 103:13–20.) Mr. Van Heel noted this on a USPS Accident Investigation Worksheet. (Ex. 103 at 8.)

14. The Smiths' Toyota Prius, valued at approximately $4,000.00, was deemed unrepairable after the collision. (Tr. 253:20–21, 299:5–21; Ex. 39.)

## II.     RESULTING MEDICAL TREATMENT

### A.      Post-Accident Treatment of Caleb Smith

15. Caleb was transported from the crash scene by ambulance to North Memorial Hospital but was not evaluated and did not receive treatment at that time. (Tr. 48:19–49:8.)

16. On June 26, 2018, Caleb was evaluated by Dr. Laurel Haycraft at Fairview Bloomington Clinic, claiming headache, fatigue, emotional distress, trouble reading and focusing since the crash, and was diagnosed with a concussion with cognitive defects. He was referred to occupational therapy. (Tr. 50:24–51:4; Ex. 4.)

17. On July 5, 2018, Caleb reported ongoing headaches and impaired cognition and was seen again at Fairview Bloomington Clinic. (Tr. 77:13–78:7; Ex. 5.)

18. Caleb began occupational therapy at Fairview Southdale Hospital several days later. (Tr. 51:1–4; Ex. 6.) He completed a total of seven occupational therapy visits through September 12, 2018. (Ex. 8 at 3.)

19. Over a year after the accident, Caleb was evaluated by Dr. Steven Lockman on July 26, 2019, at Hennepin County Medical Center, where he claimed to still be

experiencing headaches, lightheadedness, brain fatigue, eye fatigue, and bilateral ear tinnitus.  Dr. Lockman diagnosed Caleb with a mild traumatic brain injury.  (Tr. 74:21–23, 167:25–168:25; Ex. 12.)

20. Dr. Lockman referred Caleb to Dr. Amy Chang, who performed a neurovision evaluation of Caleb at Hennepin County Medical Center on August 13, 2019, and Caleb was referred to begin neurovision rehab.  (Tr. 169:18–170:18; Ex. 14.)

21. Caleb was also evaluated by a speech language pathologist at Hennepin County Medical Center on August 13, 2019, and he was assessed with mild to moderate cognitive-linguistic deficits in working memory, auditory attention/immediate memory, and retrieval fluency.  (Tr. 170:1–4; Ex. 13 at 10.)

22. Caleb underwent audiology testing on October 15, 2019, where he reported ringing in his ears and dizziness.  (Ex. 17 at 1.)  The results of the tests suggested intact saccular and inferior vestibular nerve function bilaterally.  (*Id.* at 5; *see also* Tr. 177:11–178:1.)

23. On October 15, 2019, Caleb was evaluated for physical therapy/neurological rehabilitation at Hennepin County Medical Center.  He claimed lack of recall information, as well as physical and cognitive fatigue, by the fifth hour of school.  (Tr. 171:1–4; Ex. 16 at 3.)  He received some accommodations from his teachers, and eventually a Section 504 accommodation plan was put in place

for him.  (Tr. 51:8–52:14.)  Though Caleb testified that he struggled in some classes after his accident, his school records do not suggest his academics were significantly impacted.  (*Compare* Tr. 54:22–55:2, *with* Ex. 38.)

24. Caleb underwent vestibular testing on November 1, 2019, which relates to balance issues.  The results suggested some central vestibular involvement, but all other testing was within normal limits.  (Ex. 19 at 17.)  During his appointment, Caleb reported that he had not experienced lightheadedness or imbalance in the five weeks prior to his appointment. (*Id.*; *see also* Ex. 16 at 7; Tr. 362:9–14.)

25. Caleb continued to receive care from Dr. Lockman, complaining of ongoing headaches, fatigue, irritability, anxiousness, as well as concentration issues and distractibility.  (Tr. 171:9–18, 172:13–17.)  In April 2023, Caleb reported to Dr. Lockman that he was still experiencing headaches, balance problems, fatigue, vision issues, mood issues, and thinking issues.  (Tr. 172:23–173:2.)  Dr. Lockman recommended Caleb continue with his current treatment regiment, including school accommodations through his high school career.  (Tr. 176:3–12.)

26. Caleb has been reluctant to take some conventional medicines used to treat headaches such as tricyclic antidepressants, triptans, beta-blockers, and antiepileptic medications, due to their potential for side effects and over

reliance on medications. (Ex. 36 at 4.) These medications are typical and customary treatments for chronic headaches and likely would have reduced Caleb's headaches. (Tr. 363:16–365:16, 365:3–9.)

27. Ongoing care and treatment have been recommended for Caleb due to his ongoing symptoms following his crash-related injuries. (Tr. 176:10–12.) Specifically, Dr. Lockman recommended Caleb receive Botox injections for his headaches, ongoing vestibular therapy, blue light therapy, endocrine studies, continued vision care, and that Caleb obtain a community gym membership. (Tr. 176:21–22, 177:11–12, 178:1–16.)

28. Caleb filed a claim against the USPS on April 1, 2020, seeking a total of $2,000,000.00 in personal injury damages as a result of the accident. (Ex. 1.)

29. At trial, Caleb claimed $24,834.98 for medical care that he has incurred since the collision, $500,000 for past pain and suffering, $778,012[4] for future medical care, $2,350,000 for diminished future earning capacity, and an indeterminate amount for future pain and suffering. (Tr. 511:12–20, 512:4–13, 514:8–10, 516:8–21; Ex. 37.)

---

[4] This figure represents the sum of the amounts listed at trial. Specifically, this includes $652,240 for Botox treatment for headaches, $31,954 for vestibular therapy, $57 for blue light treatment, $542 for endocrine testing, $63,960 for lifelong vision care, and $29,259 for a health club membership. (Tr. 512:4–13.)

**B.    Post-Accident Treatment of Stephanie Smith**

30. Stephanie Smith was transported from the crash scene by ambulance to North Memorial Hospital, during which she reported head pain, neck pain, and twitching in the right cheek.  (Tr. 257:5–25; Ex. 41 at 2.)

31. When she arrived at the Emergency Room, she was examined and given a prescription of Robaxin and told to take Ibuprofen as needed.  (Ex. 42 at 2.)  She was instructed to return if her symptoms worsened and to follow up with her primary care provider within the week.  (*Id.*)

32. On July 5, 2018, Stephanie was seen by Dr. Laurel Haycraft at Fairview Clinics Bloomington Lake, where she was diagnosed with a concussion, neck pain, disturbance of skin sensation, sensitiveness to light, and insomnia due to medical condition.   (Ex. 44 at 1; Tr. 125:5–17.)   Physical therapy was recommended, and she was referred for a concussion evaluation.  (Ex. 44 at 5, Tr. 337:1–14.)  During that appointment, Stephanie also informed Dr. Haycraft that she has been unable to work due to her eye/light sensitivity because she uses computer screens all day at work, which trigger her symptoms.  (Tr. 125:12–17, 265:5–10; Ex. 44 at 2.)   Traumatic brain injuries may cause symptoms such as headaches, double vision, dizziness, and light sensitivity, which may make it difficult to complete complex tasks like those Stephanie did at work.  (Tr. 125:18–126:15.)

33. Stephanie was seen by Dr. Gail Francis at the Minneapolis Clinic of Neurology a few weeks later.  (Ex. 49.)  She complained of neck pain, headaches, and photophobia, and stated that she was unable to participate in her normal activities because she had difficulty focusing on the computer because of light sensitivity and was very sensitive to noise.  (*Id.* at 1.)  Dr. Francis examined Stephanie and diagnosed her with possible post-concussive syndrome.  (*Id.* at 3.)

34. Stephanie went to the Noran Neurological Clinic for an office visit on August 6, 2018.  (Ex. 53 at 1.)  Dr. Vanda R. Niemi noted that Stephanie's MRI from June 29, 2018, appeared normal, and believed that her facial pain would likely gradually get better.  (*Id.* at 2.)  Dr. Niemi recommended Stephanie return to activities that are important to her and prescribed her a muscle relaxant.  (*Id.*)

35. It is common for individuals who have experienced a brain injury to have convergence insufficiency—meaning difficulty moving their eyes together and outwards.  (Tr. 129:4–21.)  This can cause double vision and headaches, which can be addressed with prism glasses.  (Tr. 129:13–130:7.)  On September 19, 2018, Stephanie had an appointment with Christian T. Larson, OD, at M Health Ophthalmology.  (Ex. 62.)  Dr. Larson indicated that tinted lenses and base-in prisms may be beneficial for her computer use, and he encouraged Stephanie to slowly return to activities she enjoyed before her concussion.  (*Id.* at 2.)

36. Stephanie remained under the care of Dr. Haycraft throughout 2018 and 2019, during which she communicated her concerns about sleep, light sensitivity, and headaches. (Tr. 287:16–23.)

37. On August 5, 2019, Stephanie referred herself to Dr. Steven Lockman at Hennepin County Medical Center for evaluation for her rehabilitation needs. (Tr. 130:18–132:7; Ex. 73 at 2.)  Dr. Lockman diagnosed her with a mild traumatic brain injury. (*Id.* at 3.)  He noted that he did not believe she was ready to return to work and referred her to several specialists for her various symptoms, including speech language pathology, developmental optometry, audiology, and psychology. (*Id.* at 4–5; Tr. 132:8–23.)

38. One of the specialists Dr. Lockman referred Stephanie to was Amy Chang, OD, with whom she had an appointment with on September 6, 2019. (Ex. 75.) Stephanie complained of experiencing light sensitivity, blurry vision, and pain/pressure behind both eyes. (*Id.* at 2.)  She also reported dizziness and severe headaches when reading/performing visual tasks. (*Id.*)  Dr. Chang determined that Stephanie would benefit from progressive lenses with tint and prisms, and that she should be limited to no more than 4 hours of reading/computer work per day. (*Id.* at 5.) Dr. Chang diagnosed Stephanie with binocular instability with convergence insufficiency and deficits of smooth pursuits and saccades. (*Id.*)

39. Dr. Lockman also referred Stephanie to a speech pathologist, who she saw on December 2, 2019. (Ex. 84 at 2.) Stephanie complained that she felt fatigued, had issues with insomnia and concentration. (*Id.*) The speech-language pathologist determined that Stephanie demonstrated mild cognitive-linguistic deficits in working memory, retrieval fluency and processing speed formalized testing. (*Id.* at 6.) The speech-language pathologist opined that sleep issues "may be playing a huge part" in Stephanie's reported cognitive difficulties. (*Id.*) It was recommended that Stephanie receive twice-weekly treatment for twelve weeks, but Stephanie never followed up with the speech-language pathologist or attended another speech therapy appointment. (Tr. 331:17–18, Ex. 84 at 6.)

40. Dr. Lockman also referred Stephanie to Dr. Christian Wiggs, a psychologist. (Tr. 135:1–3.) Dr. Wiggs opined that Stephanie's mood difficulties are likely related to her lack of sleep, fatigue, and headaches, so she does not meet the criteria for a mental health disorder. (Ex. 76 at 3–4.)

41. Stephanie was also referred to Dr. Samantha Anders, a psychologist who specializes in sleep. (Ex. 77 at 2, Tr. 135:10–24.) On October 14, 2019, Stephanie reported to Dr. Anders that it took her 30-45 minutes to fall asleep on average, that she awakens 3-4 times each night, causing her to be awake for about 180-240 minutes total each night. (Ex. 78 at 3.) Stephanie claims that

her sleeping problems began in June 2018.  (*Id.*)  Dr. Anders recommended Stephanie attend psychotherapy.  (*Id.* at 4–5.)

42. Stephanie had an appointment with Dr. Lockman on November 13, 2019, during which Stephanie noted that working with Dr. Anders has helped her sleep issues, but that she was still having difficulty sleeping.  (Ex. 82 at 2.)  Dr. Lockman prescribed Stephanie Trazodone to help her sleep.  (*Id.* at 3.)

43. Stephanie did not see a medical doctor specializing in sleep issues until June 8, 2022, when she was evaluated by Dr. Ralph Steele at the Minnesota Lung Center/Sleep Institute.  (Tr. 119:21–120:6.)  She had a polysomnogram on July 17, 2022, and was diagnosed with mild obstructive sleep apnea.  (*Id.* at 120:7– 12; Ex. 94 at 1.)

44. The experts who testified in this case concur that there is a **correlation** between traumatic brain injuries and sleep apnea.  (Tr. 210:9–23; 382:8–12.)  However, Stephanie has failed to prove by a preponderance of the evidence that her obstructive sleep apnea was **caused** by the collision.  (Tr. 381:7–382:2.)

45. As of April 2023, Stephanie reports that she still experiences headaches, light sensitivity, photophobia, difficulty sleeping, cognitive difficulties, and difficulty concentrating.  (Tr. 142:2–8.)

46. Ongoing care and treatment have been recommended for Stephanie due to her ongoing symptoms, and Dr. Lockman opines that she is still unable to work.  (Tr.

136:12–14.)  In 2020, Dr. Lockman recommended Stephanie receive ongoing care in the form of a neurology headache specialist, sleep specialist (which has since occurred), endocrine studies, blue light therapy, vision care, tinnitus retraining therapy, stimulant medication to treat her cognitive symptoms, speech therapy, psychiatric evaluation, psychological counseling, couples counseling, physical therapy, and a community gym membership.  (Tr. 156:13–164:18.)

## C.   Post-Accident Employment of Stephanie Smith

47. At the time of the accident, Stephanie was working as a director for Global Health Ministries.  (Tr. 242:6–10.)  Global Health Ministries provides and works with local organizations around the world to provide medical care, often focused on pediatric, maternal, and public health issues.  (Tr. 240:13–18.) Stephanie was responsible for developing partnerships, obtaining grant money, writing reports, and coordinating supplies and volunteers.  (Tr. 240:25–241:17.) Her salary was $55,000.00.  (Tr. 243:6–8.)

48. After the accident, Stephanie complained to her doctors that using a computer triggered her symptoms, making her unable to work.  (Ex. 44 at 2; Tr. 125:12–17, 265:5–10.)

49. Dr. Lockman indicated that Stephanie would likely return to work after she started speech therapy.  (Tr. 331:7–16.)  However, Stephanie only attended one

speech therapy session—despite the recommendation that she have twice weekly speech therapy appointments for twelve weeks. (Tr. 331:14–18, Ex. 84 at 6.)

50. Stephanie has not returned to work at Global Health Ministries, and she testified that she does not believe she could step into that role again given her current limitations. (Tr. 282:3–19.)

51. Stephanie has done some volunteer work since the accident. (Tr. 301:3–14.) However, she has not been employed since the accident and has not sought out jobs that may be modified to permit her to return to the workforce. (Tr. 301:19–25, 302:8–15.)

52. It is uncommon for those who have suffered a mild traumatic brain injury to be totally disabled from work. (Tr. 338:5–22.)

53. Stephanie filed a claim against the USPS on April 1, 2020, seeking a total of $2,004,000.00 in property and personal injury damages as a result of the accident. (Ex. 39.)

54. At trial, Stephanie claimed $4,000 for property damage to the 2007 Toyota Prius, $23,200.21 for past medical expenses, $500,000 for past pain and suffering, $275,000 for loss of earnings, $357,500 for loss of future earning capacity, and $3,200,000 for future pain and suffering. (Tr. 511:9–11, 516:25–

517:3, 519:24–520:3, 520:16–18, 521:11–14; Ex. 99.)  The individual future health care expenses Stephanie argued for at trial total $288,200.18.[5]

## III.  PROCEDURAL BACKGROUND

55. Stephanie and Caleb initiated this action against the United States on August 2, 2021, pursuant to the Federal Tort Claims Act ("FTCA").  (Compl., Aug. 2, 2021, Docket No. 1.)

56. A bench trial was held on May 16–18, 2023.  (1st Am. Minute Entry, May 16, 2023, Docket No. 94; 2nd Minute Entry, May 17, 2023, Docket No. 96; 3rd Minute Entry, May 18, 2023, Docket No. 97.)

57. The parties submitted proposed findings of fact and conclusions of law following the bench trial.  (Pls.' Proposed Findings of Fact, June 9, 2023, Docket No. 104; Def.'s Proposed Findings of Fact, June 9, 2023, Docket No. 105.) Plaintiffs also filed a response in opposition to the United States' proposed findings of fact.  (Pls.' Resp. Opp. Def.'s Proposed Findings of Fact, June 21, 2023, Docket No. 106.)

---

[5] This amount reflects the sum of $34,440 for future vision care, $161,839.18 for stimulant treatment for cognitive symptoms, $3,332 for speech therapy, $2,458 for physical therapy treatment for myofascial pain, $15,762 for a gym membership, $7,500 for a tinnitus/hyperacusis evaluation plus hearing devices, $39,000 for hearing device replacement, $506 for psychiatry evaluation, $11,611 for individual counseling, and $11,752 for couples counseling.  (Tr. 159:4–160:17, 162:1–163:19, 164:9–25.)

**CONCLUSIONS OF LAW**

I.     **JURISDICTION**

1.  Under the Federal Tort Claims Act, the Federal Government may be sued for the negligent or wrongful acts of federal government employees acting within the scope of their office or employment.  28 U.S.C. § 2675.

2.  District courts have jurisdiction to adjudicate these civil actions against the United States for money damages under circumstances "where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."   28 U.S.C. § 1346(b)(1).

3.  The Eighth Circuit has held that "where an act occurs within the boundaries of some State . . . that 'the law of the place' means 'the law of the State.'" *LaFromboise v. Leavitt*, 439 F.3d 792, 796 (8th Cir. 2006).

4.  The parties do not dispute that the collision occurred in Minnesota, so Minnesota state law applies.

II.    **NEGLIGENCE**

5.  To sustain a claim for negligence under Minnesota law, a plaintiff must establish (1) the existence of a duty of care; (2) a breach of that duty; (3); an injury was sustained; and (4) breach of the duty was the proximate cause of the injury.  *Lubbers v. Anderson*, 539 N.W.2d 398, 401 (Minn. 1995).   A plaintiff

must prove each element of a negligence claim by a preponderance of the evidence to recover.  *See Carpenter v. Nelson*, 101 N.W.2d 918, 921 (Minn. 1960) ("In the ordinary civil action . . . the plaintiff has the burden of proving every essential element of [their] case, including damages, by a fair preponderance of the evidence.")

**A. Duty**

6. Duty is a question of law. *Carlson v. Mutual Serv. Ins*., 494 N.W.2d 885, 887–88 (Minn. 1993).  An individual owes a duty of care that an ordinarily prudent person would exercise in the same circumstances.  *Klingbeil v. Truesdell*, 98 N.W.2d 134, 139 (Minn. 1959).

7. Under emergency circumstances, an individual has a duty to act with the level of care of an ordinarily prudent person under similar circumstances.  *Johnson v. Townsend*, 261 N.W. 859, 861 (Minn. 1935).

8. Thus, Mr. Lodermeier owed Stephanie and Caleb a duty of care to act as an ordinarily prudent person would in the same circumstances.

**B. Breach**

9. Plaintiffs have established by a preponderance of evidence that Mr. Lodermeier failed to exercise ordinary care.

10. Mr. Lodermeier had a duty to act with the level of care of an ordinarily prudent person under similar emergency circumstances.  He was aware that the USPS

tractor and long trailer takes a longer amount of time to stop than a car. (Tr. 484:7–10.) An ordinarily prudent person would therefore have maintained a sufficient distance between the USPS truck and the vehicle in front of it so that they could stop the truck in an emergency circumstance without rear-ending the vehicle in front.

11. Critically, USPS supervisor Scott Van Heel arrived at the scene of collision and investigated the accident. (Ex. 103.) On the USPS Accident Investigation Worksheet, he noted that the roads were dry, and visibility was clear. (*Id.* at 1.) He determined that Mr. Lodermeier had been "following too closely." (*Id.* at 8.) The "ROOT CAUSE" of the accident was described as "Postal driver fail to give proper following distance." (*Id.*)

12. The Court finds the USPS Accident Report Investigation Worksheet sufficient to support a finding that Mr. Lodermeier failed to act with the level of care of an ordinarily prudent person under similar circumstances. The breach element is therefore satisfied.

**C. Causation**

13. A party's negligence is the proximate cause of an injury in which the party ought, in the exercise or ordinary care, to have anticipated was likely to result in injury to others and the defendant's conduct was a substantial factor in bringing about the injury. *Lubbers*, 539 N.W.2d at 401–02.

14. In other words, a party proximately caused an injury if the injury was a foreseeable result of the party's negligent actions, and those actions were a "substantial factor" leading to the injury. *Staub as Trustee of Weeks v. Myrtle Lake Resort, LLC*, 964 N.W.2d 613, 620–21 (Minn. 2021). "There may be more than one substantial factor—in other words, more than one proximate cause—that contributes to an injury." *Id.* at 621 (citation omitted). Factual, but-for causation is "insufficient to establish liability in Minnesota." *George v. Estate of Baker*, 724 N.W.2d 1, 10–11 (Minn. 2006) (quotation omitted). If the harm would have occurred even without the negligent act, the act could not have been a substantial factor in bringing about the harm. *Id.* at 11. Thus, the Court should compare "what actually happened with a hypothetical situation identical to what actually happened but without the negligent act." *Id.*

15. The Minnesota Supreme Court has applied this concept directly to automobile accidents, explaining that "[i]f the accident could not have been avoided or would have happened even if there had been an absence of excessive speed, such speed was not a material element or substantial factor in bringing it about and hence not a proximate cause." *Draxton v. Katzmarek*, 203 Minn. 161, 164–65 (Minn. 1938); *see also Cook v. Person*, 72 N.W.2d 389, 391 (Minn. 1956) (collecting cases).

16. A party's conduct need not be the sole cause of injury to be a proximate cause. *Osborne v. Twin Town Bowl, Inc.*, 749 N.W.2d 367, 375 (Minn. 2008).

17. Plaintiffs have established here by a preponderance of the evidence that Mr. Lodermeier's breach of the duty of care proximately caused the collision. The accident could have been avoided if Mr. Lodermeier was not following the Plaintiffs' vehicle so closely. Thus, his following too closely was a substantial factor in bringing about Plaintiffs' injuries.

18. However, even though Mr. Lodermeier's breach of his duty of care proximately caused the accident, the United States' liability must be apportioned under the theory of comparative liability.

19. The Minnesota Comparative Fault Act sets forth rules governing the apportionment of damages when there are two more liable parties—even if one liable person is not actually party to the lawsuit. *See Staab v. Diocese of St. Cloud*, 813 N.W.2d 68, 75 (Minn. 2012). When two or more persons are jointly liable, contributions to the damages awards shall be in proportion to the percentage of fault attributable to each, provided the person's fault is not greater than fifty percent. Minn. Stat. § 604.02, subd. 1. If a person's fault is greater than fifty percent, they may be liable for the full damages award. *Id.*

20. The driver of the white van's failure to properly secure the ladder was a breach of the duty of reasonable care, and the failure to properly secure the ladder

was a substantial factor in bringing about Plaintiffs' injuries. If the ladder had not fallen, Plaintiffs would not have needed to come to an abrupt stop on the highway, and they would not have been rear-ended by the USPS truck. The driver of the white van is therefore also liable, even though they are not party to this lawsuit. Because there are two or more parties that are liable, the Court must determine what percentage at fault each party is for the accident and apportion damages under the theory of comparative liability.

21. The Court determines that Mr. Lodermeier is 35% at fault for the collision and the driver of the white van is 65% at fault. Though Mr. Lodermeier breached his duty of care by following too closely and that breach was a substantial factor in the accident, the accident was primarily caused by the failure to properly secure the ladder to the white van.

22. Mr. Lodermeier was acting within the scope of his employment with the USPS at the time of the collision. Accordingly, the United States is vicariously liable for Mr. Lodermeier's negligence. *See Fahrendorff ex rel. Fahrendorff v. North Homes, Inc.*, 597 N.W.2d 905, 910 (Minn. 1999).

23. Because Mr. Lodermeier was only 35% at fault for the collision, which is less than fifty percent, the damages that Plaintiffs may recover from the United States must be apportioned. The United States is only liable for 35% of Plaintiffs' total damages award.

**D. Damages**

24. Having determined that Mr. Lodermeier's conduct proximately caused the accident, and the United States is liable for 35% of the damages, the Court must determine what damages are recoverable.

25. Plaintiffs bear the burden to establish damages. *Johnson v. Paynesville Farmers Union Co-op. Oil Co.*, 817 N.W.2d 693, 706 (Minn. 2012).

26. If damages are awarded, the United States may later move the Court for deduction of collateral benefits or collateral source payments for the losses alleged. Minn. Stat. §§ 65B.51, 548.251.

### 1. Caleb Smith's Damages

#### a. Past and Future Medical Expenses

27. Past medical expenses constitute compensatory damages, which are only recoverable if they are the natural result of the wrongful act. *See Phelps v. Commonwealth Land Title Ins. Co.*, 537 N.W.2d 271, 275 n.2 (Minn. 1995).

28. Past medical expenses are not recoverable to the extent that they exceed the reasonable value of services received. *See Ince v. Aetna Health Management, Inc.*, 173 F.3d 672, 676 (8th Cir. 1999) (citing *Dahlin v. Kron*, 45 N.W.2d 833, 837–38 (1950)).

29. Caleb requests $24,834.98 for past medical expenses.  (Tr. 511:12–16, Ex. 37.)

    These expenses are largely recoverable because they are the natural result of

    the collision.

30. The Court will reduce Caleb's request for medical expenses, however, for

    treatment Caleb received for balance issues after he reported to physicians that

    his balance problems had resolved.  On October 15, 2019, Caleb informed a

    physical therapist that his "balance issues and lightheadedness [had] been

    resolved for several weeks."  (Ex. 16 at 7.)  On November 1, 2019, Caleb again

    reiterated that he had not experienced lightheadedness or imbalance for "5+

    weeks."  (Ex. 19 at 17.)  The Court therefore finds that it was unreasonable for

    Caleb to continue to receive vestibular treatment for balance issues.  (Tr.

    362:9–14; *see also* Tr. 361:22–362:5.)  The Court will therefore reduce his past

    medical expense damages by $1,518.59 for vestibular testing done after the

    balance issues had resolved and $2,033.10 for physical therapy after balance

    issues had resolved.  (Ex. 37 at 14, 16.)  The Court will therefore award Caleb

    $21,283.69 for past medical expenses.

31. Next, Caleb asks the Court for $778,012 for future medical expenses.  (Tr.

    512:11–13.)

32. Future damages, including future medical expenses, must be proved to a

    reasonable certainty and such proof cannot be remote, speculative, or

conjectural. *See Pietrzak v. Eggen*, 295 N.W.2d 504, 507 (Minn. 1980). Plaintiffs seeking future medical expenses must prove "(1) that the future harm is more likely than not to occur; and (2) that [their] future damages are not too speculative." *Bryson v. Pillsbury Co.*, 573 N.W.2d 718, 721 (Minn. Ct. App. 1998).

33. First, Caleb requests $652,240 for Botox injections for the rest of his life to help with his migraines. (Tr. 511:21–512:4.) The Court finds that this expense is not reasonably certain and will not award it. Though there is some evidence that Botox may be effective in treating headaches, (Tr. 176:21–177:9.), Caleb has not yet tried Botox treatments to help with his headaches. (Tr. 68:21–24.) Botox is considered an extreme measure. (Tr. 81:11–19.) Not only it is uncertain whether Caleb will have headaches for the rest of his life, but it is also uncertain whether Botox would even alleviate his headaches. (Tr. 372:1–20.) Caleb also does not currently meet the diagnostic criteria for Botox injections for his headaches. (Tr. 373:4–9.) Accordingly, the Court concludes that it is not reasonably probable that he will require Botox injections in the future to treat his headaches and will decline to award him these damages accordingly.

34. Second, Caleb requests $31,954 for vestibular therapy to help with his balance and walking issues. (Tr. 512:5–8.) However, as the Court has already acknowledged, Caleb reported to his doctors at least twice that his balance

issues were resolved. (Ex. 16 at 7; Ex. 19 at 17.) Though Caleb recently informed Dr. Lockman that he is still experiencing balance issues, (Ex. 36 at 1.), the Court does not find that this outweighs Caleb's multiple reports that his balance issues were resolved. Because Plaintiffs failed to establish that Caleb's future need for vestibular therapy is sufficiently certain, the Court will decline to award Caleb damages for such future therapy.

35. Third, Caleb requests $57 for blue light therapy. (Tr. 512:8–9.) Plaintiffs have provided sufficient evidence that blue light therapy is beneficial for those who have experienced traumatic brain injuries because it helps with energy and sleep. (Tr. 158:11–24, 454:15–19.) The Court will therefore award Caleb $57 for blue light therapy.

36. Fourth, Caleb requests $542 for endocrine testing. (Tr. 512:8–9.) The parties do not dispute that endocrine testing may be appropriate here. (Tr. 157:18–158:2, 454:15–22.) The Court will therefore award Caleb $542 for the endocrine screening.

37. Fifth, Caleb seeks $63,960 for vision care for the rest of his life. (Tr. 512:9–10.) The United States' expert, Dr. Steven Trobiani, does not dispute that continued vision therapy may be useful. (Tr. 454:15–20.) Caleb has been diagnosed with vision deficits as a result of the accident and uses reading glasses accordingly. (Tr. 175:7–11, 200:25–201:15.) The Court finds that Plaintiffs have established

a reasonable likelihood that Caleb will need continued vision care for the rest of his life and will award him $63,960 for this treatment.

38. Finally, Caleb asks for $29,259 for a membership to a health club for the rest of his life.  (Tr. 512:5–10.)  Dr. Lockman opined that a gym membership could be helpful for Caleb to manage his balance issues.  (Tr. 178:13–16.)  However, as already established, Plaintiffs have not shown with sufficient certainty that Caleb will experience balance issues in the future, given that he reported to his doctors multiple times that his balance issues were resolved.  The Court will therefore decline to award Caleb damages for a life-long gym membership.

### b.    Other Damages

39. Caleb also asks the Court for $500,000 for past pain and suffering, and indeterminable amount for future pain and suffering, and $2,350,000 for loss of future earning capacity.

40. Under Minnesota law, the "peculiar facts of each case must serve to measure the damages."  *Cameron v. Evans*, 62 N.W.2d 793, 799 (Minn. 1954).  "There is no yardstick that can be applied to all cases."  *Id*.  Since "[n]o two cases are alike," no "particular purpose is served by comparing verdicts."  *Id*.  Thus, any award for pain and suffering must be based solely on an individualized assessment of plaintiffs' circumstances.   The Court must "use its own

judgment" to determine what would be a reasonable award for pain and suffering. *See Berg v. Gunderson*, 147 N.W.2d 695, 703 (Minn. 1966).

41. After considering the facts of this case and the evidence presented by the parties, the Court finds that $10,000 is an appropriate amount of past pain and suffering damages for Caleb, and $20,000 is an appropriate award for future pain and suffering. Caleb was a young teenager when the collision occurred. As a result of the injuries he experienced, he was unable to participate in many of the activities that brought him joy prior to the accident, such as playing outside with neighborhood children and going on trips with his Boy Scout troop. (Tr. 41:16–25, 57:4–19.) However, it seems likely that Caleb could have reduced his symptoms earlier after the accident if he had undergone appropriate treatment. (Tr. 374:24–375:6.) The Court finds that these past and future pain and suffering awards are just and fair given the facts of this case and the evidence before the Court.

42. As for the request for damages for loss of future earning capacity, Plaintiffs must show with reasonable certainty that their earning capacity is impaired. *See Pietrzak v. Eggen*, 295 N.W.2d 504, 507 (Minn. 1980). "[U]ndisputed medical testimony that a plaintiff suffered a permanent impairment is not, standing alone, sufficient to establish the extent to which an impairment in future earning capacity is reasonably certain to occur." *Cosgriff v. Hallgren*, No.

A12-2032, 2013 WL 4779030, at *5 (Minn. Ct. App. Sept. 9, 2013) (citing *Berg*,

147 N.W.2d at 701).

43. The factfinder considering loss of future earning capacity should consider

factors such as the plaintiff's age, life expectancy, health, occupation, talents,

skill, and training. *Young v. Hansen*, 209 N.W.2d 392, 395 (Minn. 1973). This

category of general damages does not necessarily require specific proof of

actual earnings before or after the injury. *Wilson v. Sorge*, 97 N.W.2d 477, 483

(Minn. 1959).

44. Plaintiffs assert that Caleb might have earned $100,000 per year for the next

47 years if not for his injuries sustained as a result of the accident. (Tr. 516:8–

12.) However, Plaintiffs have provided no evidence in support of such salary.

In fact, Caleb testified during trial that he has achieved many accomplishments

since the accident, such as becoming an Eagle Scout, publishing a memoir, and

winning the Gold Congressional Award. (Tr. 85:20–24, 86:5–6, 87:8–16.) He

received the Duke of Edinburgh's International Award, among other awards for

his philanthropic efforts, and was successful at an international science fair.

(Tr. 87:18–88:7.) Caleb's academic grades also do not suggest a serious

diminution in his earning capacity. (Ex. 38.) These achievements highly indicate

that his success and earning capacity were not impacted by the accident.

45. Plaintiffs failed to prove that Caleb's future earning capacity was diminished as a result of the accident. The Court will therefore decline to award Caleb damages for loss of future earning capacity.

46. In sum, the Court finds Caleb's damages are $21,283.69 for past medical expenses, $57 for blue light therapy, $542 for endocrine testing, $63,960 for lifelong vision care, $10,000 in past pain and suffering, and $20,000 for future pain and suffering, for a total of $115,842.69. Because the Court concludes that Mr. Lodermeier was only 35% responsible for the accident, the United States is liable to Caleb for $40,544.94

### 2. Stephanie Smith's Damages

#### a. Property Damages

47. Stephanie asks the Court for the total value of the 2007 Toyota Prius, which was worth $4,000. (Tr. 516:22–24.) Recovery for diminished value or reasonable repair of personal property is only permitted where the harm to property does not amount to a total destruction in value. *See O'Connor v. Schwartz*, 229 N.W.2d 511, 513 (Minn. 1975).

48. The cost of repairing the 2007 Toyota Prius is greater than the total value of the vehicle. (Ex. 39.)

49. The Court finds that Stephanie is entitled to $4,000 for the total loss of the Toyota Prius.

**b.**     **Past and Future Medical Expenses**

50. Stephanie asks the Court for $23,200.21 in past medical expenses.  (516:25–517:3; Ex. 99.)  Again, past medical expenses are only recoverable if they are the natural result of the wrongful act.  *See Phelps*, 537 N.W.2d at 275 n.2.

51. The parties do not dispute that Stephanie has been diagnosed with obstructive sleep apnea.  (Ex. 93.)   The parties' experts, however, dispute whether Stephanie's sleep apnea was caused by her traumatic brain injury.  Dr. Trobiani contends that obstructive sleep apnea is not caused by traumatic brain injury. (Tr. 381:7–13.)  Rather, he asserted at trial that there is only a correlation between obstructive sleep apnea and traumatic brain injuries.  (Tr. 382:8–12.) Dr. Lockman similarly testified that there is a mere correlation between sleep apnea and mild traumatic brain injury.  (Tr. 210:9–23.) The correlation is in fact statistically the same as the prevalence of obstructive sleep apnea in the general population.  (Tr. 384:6–22.)

52. Plaintiffs have not proven by a preponderance of the evidence that Stephanie's sleep apnea was in fact caused by the accident.

53. Because Plaintiffs have not proven by a preponderance of the evidence that Stephanie's obstructive sleep apnea was caused by the accident, her past medical expenses of $307 for treatment of obstructive sleep apnea are not recoverable.  (Ex. 99 at 35.)

54. The Court finds that Stephanie's remaining past medical expenses are recoverable, so her recoverable past medical expenses equal $22,893.21.

55. In terms of future medical expenses, Stephanie requests a total of $288,200 to cover vision care, stimulant treatment, speech therapy, physical therapy, a gym membership, tinnitus evaluation, hearing device replacement, psychiatry evaluation, individual counseling, and couples counseling. (Tr. 159:4–160:17, 162:1–163:19, 164:9–25.)

56. First, Stephanie asks the Court to award her $34,440 for life-long vision care. (Tr. 159:4–15.) Dr. Trobiani agreed with Dr. Lockman that Stephanie should receive continued vision care, including yearly optometry evaluations, yearly replacement lenses, and treatment with Dr. Chang. (Tr. 413:18–25.) The Court finds that Stephanie's future need for vision care is sufficiently likely and definite and will award her damages accordingly.

57. Second, Stephanie requests $161,839.18 for Concerta, a stimulant treatment. (Tr. 161:16–18.) Dr. Lockman believes that Stephanie's brain injury caused her to experience attention and cognitive issues, as well as fatigue. (Tr. 160:20–23.) Concerta is a brand-name drug that is used to treat cognitive issues and increase focus, and Dr. Lockman opines that patients tend to tolerate it better than generic alternatives. (Tr. 161:6–18.) However, the record does not indicate that Stephanie has ever tried Concerta, so it is unknown whether a

lifelong prescription would help her.  Caleb took Concerta for about a week, but he then stopped taking it because he did not believe it was alleviating his symptoms. (Tr. 190:8–22.)  Moreover, the experts in this case dispute whether Stephanie in fact has a cognitive impairment.  (Tr. 388:14–389:10, 401:2–9.) The Court is unconvinced that a lifetime prescription to Concerta is a definite and likely future medical expense, so it therefore finds it unrecoverable.

58. Third, Stephanie requests $3,332 for speech therapy.  Dr. Lockman believes that speech therapy can be helpful for cognitive rehabilitation.  (Tr. 161:19– 162:5.) At Dr. Lockman's referral, Stephanie saw a speech-language pathologist in December 2019, who reported that "sleep issues may be playing a huge part in reported cognitive difficulties." (Ex. 84 at 6.)  That appointment was the first and only time that Stephanie has pursued speech therapy. (Tr. 161:22, 502:13– 21.)  As the Court has already determined, Plaintiffs have failed to establish by a preponderance of the evidence that Stephanie's obstructive sleep apnea was caused by the collision.  Because Stephanie's need for speech therapy to combat her reported cognitive issues is likely due to her sleeping problems, which Plaintiffs failed to establish were caused by the collision, Stephanie is unable to recover for future speech therapy treatments.

59. Fourth, Stephanie requests $2,458 for physical therapy.  (Tr. 164:9–11.)  Dr. Lockman believes that physical therapy could help Stephanie develop tools to

combat her myofascial pain.  (Tr. 163:20–164:8.)  Myofascial pain is a muscle-based pain in the neck, that is very sensitive to poor sleep, mood, vision problems, and balance problems.  (Tr. 152:10–19.)  Dr. Trobiani agreed that Stephanie's myofascial pain syndrome was likely caused by the crash.  (Tr. 417:10–17.)  Dr. Trobiani also opined that therapy can be helpful for myofascial pain.  (Tr. 400:3–19.)  The Court finds that Plaintiffs have established by a preponderance of the evidence that Stephanie will need future physical therapy to treat her myofascial pain.

60. Fifth, Stephanie asks the Court to award her $15,762 for a community gym membership.  (Tr. 164:24–25.)  Dr. Lockman believes that a gym membership would be beneficial because aerobic exercise can reduce the frequency and severity of myofascial pain flare-ups.  (Tr. 164:12–23.)  It would also be helpful for her to treat her "new diagnosis of a balance disorder."  (Tr. 337:21–338:2.)  However, Stephanie previously denied having balance issues not associated with headaches.  (Ex. 84 at 2.)  These balance issues—if any—would therefore likely be resolved if Stephanie received proper treatment for her headaches.  Moreover, there are many ways to obtain aerobic exercise.  Plaintiffs have not shown by a preponderance of the evidence that a lifelong community gym membership is a reasonably certain and necessary future medical expense.

61. Sixth, Stephanie requests $7,500 for a tinnitus/hyperacusis evaluation and $39,500 for hearing device replacement for the rest of her life. (Tr. 160:13–17.) The hearing devices pump white noise into the hears and help desensitize people's hearing. (Tr. 160:2–8.) Tinnitus is ringing in the ears and hyperacusis is a hypersensitivity to sounds, and Dr. Lockman testified that they are both common after brain injury. (Tr. 135:25–136:11.) Stephanie claims to have tinnitus and hyperacusis. She also testified that her family had to change churches because her family's prior church was too loud for her after the collision. (Tr. 277:9–21.) Dr. Lockman recommends tinnitus retraining therapy, which introduces low level sounds to desensitize the ears. (Tr. 159:16–160:12.) In contrast, Dr. Trobiani believes that Stephanie's tinnitus is mild, so it does not require treatment, and her hyperacusis is merely a symptom of her migraine that will likely resolve if the migraines are treated. (Tr. 437:1–21.) Stephanie has not tried any treatment yet for her tinnitus. (Tr. 329:24–330:4.) The Court finds that Stephanie's tinnitus and hyperacusis were caused by the collision, but that Plaintiffs failed to establish that the tinnitus retraining therapy and lifetime hearing devices specifically are a definite and likely future medical expense. Because Stephanie has not tried any tinnitus treatment yet, it is uncertain whether Dr. Lockman's proposed treatment plan would be effective. Moreover, the Court finds persuasive Dr. Trobiani's testimony that the

hyperacusis is a migraine symptom that will likely resolve when Stephanie's migraines are treated. The Court will therefore not award Plaintiffs the $7,500 for tinnitus evaluation and $39,000 for lifetime hearing device replacement.

62. Seventh, Stephanie requests $506 for a psychiatric evaluation so that she can be evaluated for pharmacologic options to treat her mood disorder. (Tr. 162:6–18.) However, Dr. Lockman repeatedly acknowledged that there are very few psychiatrists who treat brain injury patients. (*Id.*; Tr. 335:22–336:10.) Dr. Lockman testified that they have not been available for at least the last three years. (Tr. 336:9–25.) Accordingly, Dr. Lockman has not yet referred Stephanie to a psychiatrist. (Tr. 335:22–336:2.) Due to the lack of available psychiatrists that deal with traumatic brain injuries, the Court finds that this is not a reasonably likely future medical expense.

63. Eighth, Stephanie asks the Court for $11,611 for two years of twice-monthly individual psychological counseling. (Tr. 162:19–163:1.) Though there is also a shortage in psychological counselors, (Tr. 336:3–7.), Stephanie was able to receive some psychological counseling to help treat her mood issues. (Tr. 162:19–163:1.) Dr. Trobiani agrees that Stephanie would benefit from psychological counseling because she has situational depression due to her issues following the crash. (Tr. 414:4–16.) The Court finds sufficient evidence that this is a definite and likely future medical expense.

64. Lastly, Stephanie requests $11,752 for couples counseling. (Tr. 163:17–19.) Dr. Lockman explained that couples counseling may be helpful because brain injuries affect the whole family and place a great deal of stress on relationships. (Tr. 163:2–16.) Stephanie's husband testified that many of the activities they previously did together ceased after the accident. (Tr. 223:13–20.) Stephanie also testified about the toll that the accident and her recovery took on their relationship. (Tr. 284:1–24.) The Court finds this testimony constitutes sufficient evidence that couples counseling is a reasonably likely future medical expense and will accordingly award Plaintiffs $11,752.

     **c.    Other Damages**

65. In terms of non-medical and non-property damages, Stephanie asks the Court for $500,000 for past pain and suffering, $275,000 for loss of past earnings, $357,500 for loss of future earnings capacity, and $3,200,000 for future pain and suffering. (Tr. 520:2–3, 521:6–14.)

66. Again, pain and suffering awards are within the Court's wide discretion and the Court must consider the specific facts of the case at hand in determining what damages award is just and appropriate. *See Berg*, 147 N.W.2d at 703.

67. Considering the evidence presented and the testimony heard during the bench trial, the Court finds that a past pain and suffering award of $10,000 and a future pain and suffering award of $20,000 are just and fair for Stephanie. The

effects of the collision have made it difficult for Stephanie to do things that she previously enjoyed, such as hiking and playing piano for their church. (Tr. 303:15–304:8.) The effects of the accident also took a toll on Stephanie's relationships with her husband and son. (Tr. 284:1–286:11.) However, there are things Stephanie could have done to reasonably treat her symptoms, such as complete speech therapy and try conventional pharmaceuticals for her headaches. (Ex. 36 at 4.) The Court concludes that this pain and suffering award is just and fair given the facts of this particular case.

68. Loss of past earnings is an element of special damages, while loss of future earning capacity is an element of general damages. *Wilson*, 97 N.W.2d at 483. Lost wages are recoverable as compensatory damages only to the extent that they are the natural result of the wrongful act. *Phelps*, 537 N.W.2d at 275 n.2.

69. In terms of loss of past earnings, it seems likely, based on the evidence before the Court, that Stephanie could have returned to work earlier if she had received appropriate treatment for her symptoms. Dr. Trobiani testified that if she had received appropriate treatment over the last year, she would have already returned to work. (Tr. 406:18–25.) Dr. Lockman also opined that Stephanie would likely return to work after she started speech therapy. (Tr. 331:7–16.) He referred her to speech therapy in December of 2019. (Tr. 331:14–16.) Stephanie went to one appointment on December 2, 2019, but

never went to another speech therapy appointment—despite the speech-language pathologist recommending Stephanie have one or two sixty-minute sessions every week for twelve weeks. (Tr. 331:17–18, Ex. 84 at 6.) And, during that one appointment, the speech-language pathologist told Stephanie that her sleep issues "may be playing a huge part in reported cognitive difficulties." (Ex. 84 at 6.) But Stephanie did not seek treatment from a medical doctor specializing in sleep issues until she met with Dr. Steele on June 8, 2022. (Tr. 119:21–120:6, Ex. 94.)

70. Because Stephanie could reasonably have sought appropriate treatment to return to work sooner, including completing her recommended speech therapy and seeing a dedicated sleep doctor, the Court finds that Stephanie's request for loss of past earnings must be reduced. Specifically, the Court will only award Stephanie damages for her lost earnings through December 2019, when she began but did not complete speech therapy, which Dr. Lockman indicated was part of her return-to-work process. (Tr. 331:2–13.)

71. The Court will therefore award Stephanie $74,440.45 in lost wages.

72. In terms of loss of future earning capacity, it is undisputed that Stephanie will return to the workforce at some point in time. (Tr. 520:19–24.) Plaintiffs assert, without providing any evidence, that Stephanie's earning capacity will likely by impaired by $27,500 per year—half of her salary prior to the accident.

(Tr. 520:4–18.)  It is unclear what metrics, if any, were used in arriving at that estimation.

73. Moreover, "undisputed medical testimony that a plaintiff suffered a permanent impairment is not, standing alone, sufficient to establish the extent to which an impairment in future earning capacity is reasonably certain to occur." *Cosgriff*, 2013 WL 4779030, at *5.

74. Plaintiffs have provided no proof that Stephanie will suffer a loss of future earning capacity if her symptoms are properly treated.  Accordingly, Plaintiffs have not met their burden of proof on this issue and the Court will not award Stephanie damages for loss of future earning capacity.

75. In sum, the Court finds that Plaintiffs are entitled to $191,594.66 in damages for Stephanie Smith, which reflects $4,000 in property damages, $22,893.21 in past medical expenses, $34,440 for future vision care, $2,458 for physical therapy, $11,611 for individual counseling, $11,752 for couples counseling, $10,000 for past pain and suffering, $20,000 for future pain and suffering, and $74,440.45 for lost wages.

76. Because Mr. Lodermeier was only 35% at fault for the collision, the United States is only 35% liable for Stephanie Smith's damages.  Accordingly, the United States is liable to Stephanie Smith for $67,058.13.

**CONCLUSION**

The Court concludes that Plaintiffs have shown by a preponderance of the evidence that Mr. Lodermeier negligently caused the collision with the Plaintiffs' vehicle while working within the scope of his employment for USPS.  However, he was only 35% at fault for the accident, as the driver of the white van primarily caused the collision.  The United States is therefore only liable to Plaintiffs for 35% of their total damages.  After considering the Plaintiffs' requests for property damages, past and future medical damages, lost wages, loss of future earning capacity, and past and future pain and suffering, the Court finds that Caleb Smith is entitled to a $115,842.69 damages award and Stephanie Smith is entitled to a $191,594.66 damages award, for a total of $307,437.35.  Because the United States is only liable for 35% of the damages award, it is liable to the Plaintiffs for a total of $107,603.10.


**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Judgment be entered for Plaintiffs and against Defendants in the collective sum of $107,603.10, as specified above; and

2. Defendant's Motion in Limine as it pertains to Joint Exhibits 35, 95, 96, and 100 [Docket No. 74] is **DENIED** as moot.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATED:  September 22, 2023
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge